COURT OF APPEALS OF VIRGINIA


Present:    Judges Benton, Haley and Senior Judge Bumgardner
Argued at Alexandria, Virginia


ISMAIL TAKOW, S/K/A
 ISMAIL AHMED TAKOW

                                                        MEMORANDUM OPINION[*] BY
v.        Record No. 2967-04-4                     JUDGE JAMES W. HALEY, JR.
                                                            JUNE 6, 2006

COMMONWEALTH OF VIRGINIA


                FROM THE CIRCUIT COURT OF ARLINGTON COUNTY
                        Benjamin N.A. Kendrick, Judge

        John C. Kiyonaga for appellant.

        Michael T. Judge, Assistant Attorney General (Judith Williams
        Jagdmann, Attorney General; John H. McLees, Senior Assistant
        Attorney General, on brief), for appellee.


        Convicted by jury of involuntary manslaughter and reckless driving, Ismail Takow

appeals from his motion to set aside the verdict.  He asserts the trial court deprived him of

adequate interpreter services and erred in concluding that he understood the process of his trial,

in violation of his due process rights.  We affirm.

                                          I.

        "On appeal, 'we review the evidence in the light most favorable to the Commonwealth,

granting to it all reasonable inferences fairly deducible therefrom.'"  Peake v. Commonwealth,

46 Va. App. 35, 37-38, 614 S.E.2d 672, 674 (2005) (quoting Archer v. Commonwealth, 26

Va. App. 1, 11, 492 S.E.2d 826, 831 (1997) (citation omitted)).

---

        [*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

## II.

On May 19, 2003, appellant, a native of Somalia, struck and killed a pedestrian, Albert Davis, while driving for the Arlington Yellow taxicab company in Arlington, Virginia. He was subsequently charged with involuntary manslaughter and reckless driving.

### A.

### TRIAL

Appellant's trial was continued three times before proceeding on April 26, 2004. None of the continuance orders found in the record reflect that the case was continued so appellant could retain an interpreter.

On day one of the four-day trial, the trial court attempted to determine whether or not appellant spoke English well enough to understand the trial process. During an exchange with both appellant and his counsel, the trial judge ascertained the following: 1) appellant has resided in the United States since 1997; 2) he knew English well enough to obtain and hold a driver's license; 3) he followed directions given by his employer which are written in English; 4) he conversed with passengers in English; and 5) he accepted and made change in U.S. currency. Appellant himself answered the judge's questions pertaining to the last three points. Counsel responded that the language problem centered more on appellant speaking, rather than appellant's understanding of English.

Thereafter, the trial court asked if anyone present in the courtroom, which at the time contained many individuals of Somali descent, "could help [the defendant] understand what's going on." Mohamed Ali Hassan responded that appellant was a friend of his, and he would help him throughout the trial. The judge instructed him to come forward, take a seat, and "promise to do a good job." Hassan told the judge that he had been in the United States for 23 years and spoke "good English." Appellant's counsel stated that he was "concerned about this gentleman,

- 2 -

[didn't] know anything about him, or his qualifications." The trial court responded, "I am satisfied that your client communicates well enough to know what's going on in this case. . . . But in an abundance of caution, I want someone that he's comfortable with to explain any difficulties that may arise."

Later that same day, appellant's counsel expressed concern that Hassan was paraphrasing and needed to translate verbatim. The trial court asked Hassan, "To the extent that you can, would you do that? Can you do that for him?" Hassan responded, "Yes, that's fine. I don't know nothing about technical likeness translating." The next day, appellant's counsel informed the trial court that he had spoken with Hassan to make sure that future translations would be verbatim. Counsel admitted that Hassan spoke "both languages [] quite well."

The following recounts the witnesses called by the Commonwealth during day one of the trial and a brief synopsis of their testimony: 1) Mary Bielefed testified about her close relationship with Albert Davis, her visit to the hospital on the day of the accident, and Davis' death eleven days later; 2) Darren Smith explained the closed-circuit television system which captured the accident; 3) Christopher McKay testified as an eyewitness to the accident; and 4) Avery Kent, also an eyewitness, testified as to her observations.[1] At no time during the testimony of these witnesses did appellant ask for clarification or express that he did not understand the testimony, nor did counsel express any such concern.

Finally, Detective Doug Johnson of the Arlington Police Department appeared as a witness on day one of trial. He testified that while working off-duty for a security company, he witnessed the collision between appellant's vehicle and Davis. After rendering assistance at the scene, Johnson, along with two other detectives, interviewed Takow. During cross-examination,

---

[1] Also on day one, the Commonwealth introduced into evidence both still photographs of the accident scene and a CCTV video depicting the accident.

appellant's attorney questioned Johnson, as follows, on Takow's ability to speak English and interact with the detectives:

> Q: Did you notice that he had any trouble speaking English?
>
> A: That was a situation we broached right from the beginning, and I tried to explain to him that if we came to that road where we couldn't understand each other that we'd try to make other arrangements, and he continued to speak English with me the entire time I spoke to him.
>
> Q: Kind of, broken English?
>
> A: I wouldn't necessarily say broken, if there was something that was not necessarily said, in context I just rephrased it so it was understandable.
>
> Q: Okay.
>
> A: But the entire interview was in English.

On day three of trial, the Commonwealth presented stipulations of fact "upon which the Commonwealth and the Defendant have agreed."[2] The stipulation of facts included references to photos of the accident scene, a surveillance video that by happenstance had recorded the accident, and the distance between impact and the stopping point of the vehicle. It also recited that appellant "would get his fares through dispatch from the Red Top Cab Company and from roaming the roads." That stipulation concluded with the following:

> My name is Ismail Takow, and I am the defendant in this case. On May 19, 2003, I was driving a Yellow Cab taxi on Fairfax Drive in Arlington. At about 7:40 p.m. I drove the taxi into the intersection of Fairfax Drive and North Nelson Street and struck a pedestrian named Albert Davis. Mr. Davis died from injuries that he sustained when I struck him with my taxi.
>
> I have read this Stipulation, and my attorney has read this Stipulation to me. *I speak and understand English*, and I

---

[2] Day two consisted of convening the jury for a view of the accident scene.

understand the factual statement set out above and agree to the
accuracy of those facts.

(Emphasis added).  Appellant signed the above statement.

Appellant thereafter presented a motion to strike.  At no point during his argument did appellant's counsel mention the interpreter or appellant's failure to understand the proceedings.  After denying Takow's motion to strike, and as appellant prepared to testify, the trial judge stated, "Mr. Takow, let me know if anything that I say is not clear to you or you do not understand."  Appellant responded, through Hassan, "I can tell you, sir."

Appellant testified at length in his own defense.  Hassan translated this testimony from Somali into English.[3]  During this testimony, the Commonwealth objected to the relevance of several background questions.  At a bench conference outside the hearing of the jury, appellant's counsel argued that he should be able to "ask how long he's been speaking English, how long he's been in this country."  The trial court responded,

> Well, I don't see any problem -- well, okay, with that.  But that's going to open up the Commonwealth to go into matters that cut the other way.  I mean, he did take a driver's test.  It was in English.  He's spoken in English.  He communicated with people in English.
>
> * * * * * * *
>
> He works in an area that requires to be familiar with highway signs, English.  He translates -- I mean, he communicates in English.  So, all that's opened up, if you want to go there.

Thereafter, counsel asked appellant "how good is your command of English?"  Appellant responded, through Hassan, "My understanding is much better than responding.  I have difficulty of [sic] responding."

---

[3] As previously noted, appellant advised the trial court that he understood English but had some difficulty expressing himself in English.  Takow testified in Somali through the interpreter and obviously heard the immediate interpretation of his testimony into English.  At no time during his testimony did appellant ever suggest or claim that the English translation of his testimony was inaccurate or misleading, nor did he ever offer any corrections to the same.

Marvin Carroll, a safety investigator for Transportation General, Inc., appeared as a rebuttal witness and testified about an interview he conducted in English with appellant after the accident. The Commonwealth asked Carroll if he asked appellant "if he had any explanation at all as to why he did not see this man in the intersection." Carroll responded that appellant told him that "he had no explanation for that." Again, at the conclusion of Carroll's testimony, neither appellant nor counsel maintained that his testimony was not understood.

The jury convicted appellant of involuntary manslaughter and reckless driving. The jury sentenced him to three years imprisonment on the first charge and twelve months with a $2,500 fine on the second charge.[4]

B.

MOTION TO SET ASIDE THE VERDICT

Thereafter, and with the assistance of new counsel, appellant filed a motion to set aside the verdict. Along with the written motion, appellant submitted an affidavit signed by Mohamed Ali Hassan, the trial interpreter, which claimed he only "translated approximately 20% of the proceedings and that portion was generally paraphrased." Appellant also submitted an alternate translation from an individual who claimed to be a Somali interpreter.[5]

At the motion hearing, appellant's new counsel claimed appellant needed an interpreter before proceeding and stated that the interpreter he had arranged to be present was "not here."

[4] At no time during the trial did appellant's trial counsel claim that his client was deprived of constitutional due process rights because of language differences; that is, while there may have been difficulties, those difficulties did not rise to constitutional dimension.

[5] During argument, appellant's counsel told the trial court, "It's my understanding, sir, the Commonwealth is not going to contest the authenticity of the transcript I've submitted." However, the Commonwealth, later in the proceeding, explained, "First of all, Judge, the transcript that counsel introduced. Our stipulation is not to the accuracy of it. . . . I just wanted to make that clear, Judge, that we did not agree to the accuracy of anything."

- 6 -

The trial judge acknowledged counsel's claim and commenced the following exchange, directly with appellant:

> THE COURT: You have filed a motion for subpoenas duces tecum, pro se[?]
>
> MR. TAKOW: Yes.
>
> THE COURT: Well, did you prepare that motion?
>
> MR. TAKOW: My friend did.

The judge asked appellant again if he filed the motion, to which appellant directly answered "Yes. . . . My friends did." The judge then advised appellant, "I think you speak English when it's convenient for you. And you have trouble with it when it's not to your advantage is what I think."

Appellant's counsel informed the trial court that neither his witnesses nor interpreter were present. He then said, "Nobody is testifying, Your Honor. There is no interpreter." Counsel then stated, "I would like to submit that motion on the papers without argument today, but I would like to withdraw one of the affidavits, which is the affidavit by Mohamed Ali Hassan, who was the courtroom interpreter." Appellant's counsel thereafter learned that Hassan was present in the courtroom.

The Commonwealth presented Robert Carrig, a safety inspector with the transportation company that oversaw the Arlington Yellow taxicab company. He testified that appellant attended a mandatory training class, which Carrig taught, and that the class was conducted in English. Carrig also testified that he interviewed appellant, in English, after the accident. During his testimony, the Commonwealth introduced Takow's cab manifest from May 19, 2003. That manifest, which appellant filled out in English, included information relating to time, locations, number of passengers, and fares. Appellant had filled out such a manifest every day of his employment.

- 7 -

Frank Malari, a police officer with Arlington County's licensing unit, testified that each prospective cab driver must pass one of four exams, administered only in English, before obtaining a cab license. Malari explained, "The reason why there's four is because they're allowed to take it four times . . . before they can reapply." The Commonwealth introduced into evidence all four exams, each of which contained 50 multiple-choice questions written in English. Malari knew "that [appellant was] licensed in the County," but couldn't recall when appellant took the test.

The Commonwealth also introduced into evidence the twenty-five-page transcript of the interview conducted by Detectives Johnson, Penn, and Robinson. The transcript reflected that the entire interview was conducted in English.

Hassan testified that he translated "100 percent" when appellant testified at trial. When asked about the other portions of the trial, Hassan responded, "I said in the paper, 20 percent. My point is I was here and there. I don't know how to estimate, but I can tell you, it was not full." On cross-examination, Hassan said "this [affidavit] was been given to me, and I was asked my opinion, and I said this is accurate and true." He stated, "I do speak both languages fluently." He also testified that in instances where appellant did not seem to understand, he "told him what was going on."

After each side presented argument, appellant's counsel asked the trial court to accept the affidavit attesting to his translator's expertise and experience, despite the fact that she was not present. The trial court declined to do so by stating, "If she was here, that would be one thing, but I'm not going to take your representation that this interpreter gave you that it's accurate and true." The trial court immediately thereafter denied counsel's motion for continuance to secure the translator.

The trial court next noted that the presentence report was not prepared; "one was requested, but it was not prepared." The judge recited that the probation officer "attempted to interview the defendant, and in clear English, [appellant] stated, quote, My attorney told me not to talk to you."

The trial court denied appellant's motion to set aside the verdict and noted the following, with respect to appellant's own ability to understand English: 1) he prepared cab manifests in English; 2) he took and passed a forty-question test given to new cab drivers that is in English; 3) he signed a stipulation of fact that read "I speak and understand English, and I understand the factual statement set out above and agree to the accuracy of those facts"; 4) "he answered questions during [the police] interview, all in English"; and 5) he gave a recorded statement to the cab company in English. The court found that appellant,

> did, in fact, understand and communicate not only with the interpreter, but with his attorney during the course of the proceedings, that they were interacting with each other and that interaction was without fault. . . . The Court further finds that this whole English issue at this time is an afterthought. It's this Court's opinion that this is an attempt by the defendant to add a basis for appeal or to bolster his attempt to overturn the jury's verdict on appeal.

After this ruling, appellant's translator arrived. The court allowed her to testify as to her credentials and allowed her to act as appellant's translator during sentencing. The trial court did not rule on her qualification as an expert, nor did the court admit her modified translation of the trial proceedings.

Despite her presence, appellant stated the following - in English - on his behalf during allocution:

> Yes. I have a question about the Government witness who speaks about what happened, and I have a question about that. I wasn't speeding. I'm very sorry about what happened. I'm very sorry,

the pain I caused, but I would like you to know I was not speeding, and I did not intend to do what I did.

Thereafter, at the conclusion of the hearing, appellant stated in English, "I would like to appeal."

III.

Initially, we note, "[t]he conduct of the trial is committed to the discretion of the trial court." Watkins v. Commonwealth, 229 Va. 469, 484, 331 S.E.2d 422, 433 (1985) (citing Justus v. Commonwealth, 222 Va. 667, 676, 283 S.E.2d 905, 910 (1981)). With respect to the presence of an interpreter, Code § 19.2-164 states, in pertinent part:

> In any criminal case in which a non-English-speaking person is the accused, an interpreter for the non-English-speaking person shall be appointed. . . . An English-speaking person fluent in the language of the country of the accused, a victim or a witness shall be appointed by the judge of the court in which the case is to be heard, unless such person obtains an interpreter of his own choosing who is approved by the court as being competent.

As this Court has recognized, "the use of an interpreter is a matter committed to the sound discretion of the trial court." Stubblefield v. Commonwealth, 10 Va. App. 343, 350, 392 S.E.2d 197, 200 (1990). See also Perovich v. United States, 205 U.S. 86, 91 (1907) ("[The use of an interpreter] is a matter largely resting in the discretion of the trial court . . . ."); United States v. Rodriguez, 424 F.2d 205, 206 (4th Cir. 1970) (per curiam) ("Use of an interpreter is a matter within the sound discretion of the trial court." (citation omitted)). Moreover, "[t]he judge presiding at the proceedings being transcribed determines 'the veracity of the proceedings before him' . . . [and] whether 'the interpreter is performing . . . her duties satisfactorily' by translating . . . with a 'reasonable degree of accuracy.'" Saunders v. Commonwealth, 38 Va. App. 192, 196, 562 S.E.2d 367, 369-70 (2002) (quoting Stubblefield, 10 Va. App. at 350, 392 S.E.2d at 200).

Here, despite finding that appellant "communicates well enough to know what's going on in this case," the trial court, out of "an abundance of caution," provided an interpreter during the trial. That interpreter, Hassan, told the trial judge that he spoke both his native language of

- 10 -

Somali and "good English," in accordance with the requirements of Code § 19.2-164.  Moreover, at the motion hearing he confirmed that he spoke both Somali and English fluently.

The trial judge further found that the interaction between Takow, the interpreter, and his attorney "was done effectively."  Thus, the trial judge concluded, "They understood each other, and I saw nothing during the course of the trial that would suggest that the defendant did not know what was going on."  We hold that the evidence supports the trial court's finding.

Moreover, and as noted above, the trial judge observed the following as to appellant's own understanding of English:  1) Takow responded "in clear English" to the probation officer's request to speak with him by saying "My attorney told me not to talk to you"; 2) Takow's daily cab manifests were in English; 3) Takow took and passed a test, seven pages in length, in English in order to earn his cab license; 4) Takow underwent a "lengthy" interview with police "where it's obviously clear that [he] understood English"; 5) Takow made a recorded statement at the cab company's headquarters in English; and finally, 6) Takow agreed to a stipulation of fact dated April 1, 2004 which stated:  "I speak and understand English, and I understand the factual statement set out above and agree to the accuracy of those facts."  This led the trial judge to conclude "that this whole English issue at this time is an afterthought."

Appellant asserts that his constitutional right to due process was violated "because the trial court deprived [him] of the interpreter services necessary to enable him to understand his trial and participate in his own defense."  We disagree.  As this Court held in Stubblefield,

> The constitutional guarantee of due process "is, in essence, the right to a fair opportunity to defend against the State's accusations." Chambers v. Mississippi, 410 U.S. 284, 294 (1973). This guarantee encompasses both the right of a defendant to confront witnesses against him and the right to assist in his own defense. . . . The Constitution does not, however, guarantee every defendant a perfect trial.  The rights vouchsafed are practical, reasonable rights rather than ideal concepts of communication.  It is clear in this case that the interpreter translated the testimony of the victim within reasonable limits of accuracy, such that the

> defendant was granted a fair trial. In this case, due process was satisfied.

10 Va. App. at 351, 392 S.E.2d at 200-01.

Here, the judge found, as quoted above, that appellant's interaction with his attorney "was done effectively." Aside from the initial exchange that resulted in the appointment of the interpreter, at no point during the entire trial did appellant, or his counsel, suggest or contend that he did not understand the evidence, testimonial or otherwise, all of which was in English. Consequently, appellant was not deprived of the right to assist in his defense. Thus, we hold that appellant's due process rights were not violated, as he enjoyed "a fair opportunity to defend against the State's accusations." Chambers, 410 U.S. at 294.[6] Therefore, appellant's convictions are affirmed.

Affirmed.

---

[6] Appellant also sought to challenge the accuracy of the translation through introduction of an alternate transcript made from the trial's audio recording. However, appellant's "expert" was not present at the motion hearing and, accordingly, the trial judge did "not accept the attorney's representation as to the ability and expertise of his interpreter by way of affidavit, and therefore, discounts her expertise as to the validity of the proper transcript." Therefore, the official, certified transcript was the only record of the proceedings, as the trial court rejected the modified, comparative transcript. Moreover, we note that, "the transcript in any case certified by the reporter or other individual designated to report and record the trial shall be deemed prima facie a correct statement of the evidence and incidents of trial." Code § 19.2-265.

Benton, J., dissenting.

The Due Process Clause, as applied to the states through the Fourteenth Amendment, guarantees that every defendant shall receive a fair trial. Strickland v. Washington, 466 U.S. 668, 684-85 (1984). Inherent in a fair trial is the defendant's right to be confronted with adverse witnesses. Pointer v. Texas, 380 U.S. 400, 403-05 (1965). "[T]he right of confrontation and cross-examination is an essential and fundamental requirement for the kind of trial which is this country's constitutional goal." Id. at 405. When a defendant cannot sufficiently communicate in English, the right of confrontation is imperiled as is the defendant's right to be present at his trial. United States ex rel. Negron v. New York, 434 F.2d 386, 389 (2d Cir. 1970).

> [I]t is equally imperative that every criminal defendant—if the right to be present is to have meaning—possess "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding." Dusky v. United States, 362 U.S. 402, 80 S. Ct. 788, 4 L.E.2d 824 (1962) (per curiam). Otherwise, "[t]he adjudication loses its character as a reasoned interaction * * * and becomes an invective against an insensible object."

Id. (footnote and citation omitted). Thus, to deny a non-English-speaking defendant access to a qualified interpreter denies that person the "basic and fundamental fairness required by the Due Process Clause of the Fourteenth Amendment." Id.; see also People v. Aguilar, 677 P.2d 1198, 1203 (Cal. 1984) (noting that an interpreter is warranted when the defendant is unable to speak and understand English sufficiently to comprehend the proceedings); People v. Annett, 59 Cal. Rptr. 888, 890 (Cal. Ct. App. 1967) (due process is implicated by failure to appoint an interpreter for a defendant who does not understand English).

Prior to trial, Takow's attorney informed the trial judge that he had difficulty communicating with Takow because of Takow's limited English.

> THE COURT: And you haven't had any difficulty communicating with him, have you?
>
> MR. WOEHRLE: I have.

- 13 -

THE COURT: You have?

MR. WOEHRLE: Yes, there have been a number of times when I've tried to talk to him on the telephone and I couldn't make out what he said. I would just try to communicate to him to meet me at a date, time, and place. For example, trying to arrange to meet with him yesterday. I stayed at a hotel here, so I would not risk -- I live in Fredericksburg, and I stayed up here. I tried to tell him which hotel and what time to meet me was a major obstacle.

THE COURT: How have you resolved these language barriers and conflicts?

MR. WOEHRLE: He has had members of his family come with him and help me translate things, so that he has a better understanding. For example, the day we signed a stipulation of fact, the Commonwealth, some members of his family to try to help him understand the words, and they were very uncomfortable with some words that were being discussed. I don't think all the group that was present completely understood the importance of some of the words, so we tried to arrange different words. As I have examined the transcripts of the interrogations of my client, and even a handwritten statement that he made of the event, it's extremely broken English. A lot of the sentences are not complete, they trail off. So, it is clear that he does not communicate very well in English.

Obviously, he had to know English well enough to get a driver's license.

*     *     *     *     *     *     *

THE COURT: I understand. And you're having difficulty talking to him right now?

MR. WOEHRLE: Several of the sentences that I've tried to communicate with him, I didn't understand what he said in response. I had to wait for him to repeat it to me. And that has been a consistent pattern. There have been days when I have talked to him by cell phone, for example, and I couldn't understand anything that he said. And it wasn't transmission, it's that when he tries to communicate in a sentence, I pick up one or two words in the sentence that made any sense in English to me.

THE COURT: Is there someone in court right now, who is part of the Somalian community that could help you understand what's going on? Look around, do you see anybody here that could help you?

- 14 -

(Brief pause.)

MR. WOEHRLE:  I don't know who this gentleman is, I've never met him.

THE COURT:  Would you state your name?

MR. HASSAN:  Mohamed Ali Hassan.

Over objection, the trial judge indicated that he would not delay the trial to locate a qualified interpreter.  He impressed into service Hassan, a taxi driver, to assist Takow and his attorney.

THE COURT:  I say we're going to trial, and we ought to go right now.

MR. WOEHRLE:  I would like to state my objection for the record.

THE COURT:  All right.

MR. WOEHRLE:  The biggest concern I have, I know when the Court acquires translators, one of the things they do is to make sure that the people are familiar with some technical terminology.  And, of course, not being a certified translator, a person who has tutored skills, has gone to school for the purpose, might not understand some of the technical - -

THE COURT:  Such as?

MR. WOEHRLE:  The issues that may come before the Court, a motion in limine.  I'm sure that this man has never heard the term motion in limine, and has no idea what it is.

THE COURT:  Well, you're going to explain it to him.  You're going to explain it to him, and you're going to explain it to your client, and if there's any problems, we're going to explain it again, and again, and again, until everybody is happy that they understand what is going on.

Hassan was not sworn and was instructed to assist Takow and his attorney.

Virginia law requires more.

In any criminal case in which a non-English-speaking person is the accused, an interpreter for the non-English-speaking person shall

be appointed. In any criminal case in which a non-English-speaking person is a victim or witness, an interpreter shall be appointed by the judge of the court in which the case is to be heard unless the court finds that the person does not require the services of a court-appointed interpreter.

Code § 19.2-164. We are required to examine a statute in its entirety and determine the legislative intent from the plain and natural meaning of the words the General Assembly used in the statute. Graybeal v. Commonwealth, 228 Va. 736, 739, 324 S.E.2d 698, 699-700 (1985). When the legislature has used unambiguous words in crafting the statute, this Court is bound by the plain meaning of those words. Commonwealth v. Diaz, 266 Va. 260, 265, 585 S.E.2d 552, 554 (2003).

The statute provides that when the non-English-speaking person is the victim or other witness in criminal cases, the judge shall, in his discretion, appoint an interpreter unless he finds that an interpreter is unnecessary. Code § 19.2-164; see also Saunders v. Commonwealth, 39 Va. App. 192, 194, 562 S.E.2d 367, 369 (2002) (reiterating this Court's holding in Stubblefield v. Commonwealth, 10 Va. App. 343, 348, 392 S.E.2d 197, 199 (1990)); Stubblefield, 10 Va. App. at 348, 392 S.E.2d at 199 (holding that it was within the trial court's discretion whether to appoint and who to appoint as an interpreter for the complaining witness). The plain language of the statute permits such discretion where the non-defendant witness is non-English-speaking. Where the *defendant* is non-English-speaking, however, the judge is afforded no discretionary power and, instead, must appoint an interpreter. See Code § 19.2-164 ("In any criminal case in which a non-English-speaking person is the accused, an interpreter for the non-English-speaking person *shall* be appointed." (emphasis added)).

As the record demonstrates, Takow's attorney informed the judge of the difficulty in communicating. The trial judge engaged in voir dire of Takow to determine whether he believed Takow needed an interpreter. The judge concluded that Takow "communicates well enough to

know what is going on in this case . . . . But in an abundance of caution, I want someone that he's comfortable with to explain any difficulties that may arise." The judge then asked for a Somali-speaking volunteer, Hassan, from the audience and made him "promise to do a good job [translating]." The transcript indicates Hassan was purporting to translate Takow's testimony but paraphrased to Takow only portions of the rest of the trial.

In a motion to set aside the verdict, Takow's attorney proffered a comparison between Hassan's translation and a translation by an experienced Somali interpreter that was made from an audiotape of his trial. The comparison revealed numerous errors. It also showed a discrepancy between the experienced interpreter's transcription of Hassan's translation and the court reporter's transcript of Hassan's words. Moreover, Hassan conceded that he translated approximately a mere twenty percent of the proceedings.

Virginia has established standards to guide courts and interpreters. Serving Non-English Speakers in the Virginia Court System: Guidelines for Policy and Best Practice, available at http://www.courts.state.va.us/interpreters/guidelines.pdf. These guidelines require that interpreters take an oath and translate "as close to verbatim as possible without paraphrasing, altering, omitting, summarizing, or adding anything to what is stated." Id. at 18. This trial proceeded in derogation of the statute and these principles. Thus, I would hold that the trial judge erred in exercising his discretion as to determine whether Takow needed an interpreter and further erred in allowing Hassan to translate portions of the trial. Simply put, Takow's statutory and due process rights were violated by failing to provide him with a competent, experienced interpreter that would allow him to participate in his defense.

For these reasons, I would reverse Takow's convictions for involuntary manslaughter and reckless driving.